# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fair Isaac Corporation,                                    Civil No. 12-547 (SRN/AJB)
a Delaware corporation,

             Plaintiff,

     v.                                         **MEMORANDUM OPINION**
                                                          **AND ORDER**
Royal Caribbean Cruises, Ltd., a
Liberian corporation,

             Defendant.

---

Nadia B. Hasan, Heather L. Marx, Steven H. Silton, and Thomas P. Kane, Hinshaw & Culbertson, LLP, 333 South Seventh Street, Suite 2000, Minneapolis, Minnesota 55402, for Plaintiff.

Carrie Ryan Gallia, Mark A. Jacobson, and Christopher R. Sullivan, Lindquist & Vennum, PLLP, 80 South Eighth Street, Suite 4200, Minneapolis, Minnesota 55402, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

     This matter is before the Court on Plaintiff's Motion to Dismiss Counterclaims [Doc. No. 12]. For the reasons stated below, Plaintiff's Motion is granted and Defendant's counterclaims are dismissed with prejudice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

     Plaintiff Fair Isaac Corporation ("Fair Isaac") brought this suit against Defendant Royal Caribbean Cruises, Ltd. ("Royal Caribbean"), arising out of a dispute involving a contract for computer software and services. (Compl. ¶ 9 [Doc. No. 1].) In May 2011, cruise ship operator Royal Caribbean solicited bids from vendors pursuant to a Request

for Proposal ("RFP") for computer software to create a Business Rules Management

System ("BRMS").  (Id. ¶ 8; Answer ¶ 8, Ex. 1 to Aff. of Nadia B. Hasan [Doc. No. 18-

1].)   The purpose of the BRMS was "to enable [Royal Caribbean] to make changes to

business policy by empowering business managers to directly implement their policies

and rules as business needs change."  (RFP at 4, Ex. 2 to Hasan Aff. [Doc. No. 18-2].)

The RFP lists the following five categories of "Functional Requirements" for the

requested BRMS Project: (1) Business Rules Management; (2) Business Rules

Repository; (3) Business Rule Testing and Simulation; (4) Business Rule Integrated

Development; and (5) Business Rule Deployment and Runtime Environment.  (Id. at 9-

13.)  In addition, the RFP enumerated four categories of "Non-Functional Requirements":

(1) Overall Non-Functional Requirements; (2) Third-Party Integration Support; (3)

Performance and Scalability Requirements; and (4) Security.  (Id. at 14-16.)

     Royal Caribbean received three bids in response to its RFP, including a response

from Fair Isaac.  Fair Isaac is a Minnesota corporation that provides analytics and

decision management technology including business rules management software.

(Countercl. ¶ 2, Ex. 1 to Hasan Aff. [Doc. No. 18-1]; RFP Response at 2, Ex. 3 to Hasan

Aff. [Doc. No. 18-3].)  Fair Isaac's response was entitled "Business Rules Management

System (RFP) Response:  Using Blaze Advisor Rules Technology (Increasing Flexibility

While Reducing time to Market)" ("RFP Response").  (RFP Response, Ex. 3 to Hasan

Aff. [Doc. No. 18-3].)  Fair Isaac's RFP Response included disclaimers, including the

following:

     This proposal is provided to assist [Royal Caribbean] in evaluating [Fair

Isaac]'s products and services. This proposal is not the basis of any agreement between the parties and does not form a contract between the parties. The actual terms and conditions of an agreement executed between [Royal Caribbean] and [Fair Isaac] will govern the license of products or purchase of services.

(RFP Response, Appendix A at 77, Ex. 3 to Hasan Aff. [Doc. No. 18-3].)

Royal Caribbean selected two finalists for the RFP, including Fair Isaac, and invited the finalists to conduct a "Proof of Concept" demonstration of their respective proposed solutions. (Countercl. ¶ 14, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) Royal Caribbean alleges that during Fair Isaac's Proof of Concept demonstration, Fair Isaac's representatives made representations concerning its ability to perform the BRMS Project. (Id. ¶ 15.) Further, Royal Caribbean contends that based on those representations, it selected Fair Isaac as the vendor for the BRMS Project. (Id. ¶ 16.)

In October 2011, the parties entered into a Statement of Work (frequently referred to in the Software Agreement as the "SOW") regarding the project, which was attached to and incorporated into the Software License and Services Agreement (the "Software Agreement"). (Software Agreement, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) The work on the project commenced on or about October 11, 2011. (Countercl. ¶ 17, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) The parties signed the Software Agreement in November 2011. (Software Agreement, Ex. 4 to Hasan Aff. [Doc. No. 18-5].)

In the Software Agreement, Royal Caribbean purchased a license to use certain Fair Isaac software and to obtain certain enumerated services. (Id. at 2, 4.) The license granted Royal Caribbean rights to use the Fair Isaac software products listed on Exhibit B, Third Party Software, and any deliverables described in Exhibit D. (Id. at 2.) Exhibit

3

B to the Software Agreement lists five product licenses purchased by Royal Caribbean and the accompanying product documentation.  (Id. at 15-18.)  Exhibit D enumerates ten "Other Services" that Fair Isaac was to provide in support of the five product licenses purchased by Royal Caribbean, and fourteen deliverables that Fair Isaac agreed to provide at a later time.  (Id. at 25-32.)

The Statement of Work, Exhibit D to the Software Agreement, sets forth the services Fair Isaac was to perform pursuant to the Software Agreement.  (Id. at 24-26.) Under the Statement of Work, Fair Isaac agreed to implement three reports as part of its services - a scenario report, a validation report, and a statistics report.  (Id. at 26.)  In addition, the Statement of Work provides that Fair Isaac was to provide one "integration" to Royal Caribbean, with up to 200 hours of assistance.  (Id.)  Provisions in the "Assumptions" section of the Statement of Work state that there will be "no more than 700 pricing programs types harvested" and that Royal Caribbean's "total atomic rule volume" will not exceed 1000 rules.  (Id. at 28, § 5.1.6.)  The Assumptions section also notes that Fair Isaac will provide "out-of-the-box features of Blaze Advisor, without customization or integration with third-party software."  (Id. at § 5.1.8.)

The Statement of Work further contains a Section entitled "Changes to Other Services; Out of Scope Other Services" which provides as follows:

> Either party may submit a written (email or other writing) request for additions or changes to the Other Services, including a reasonably detailed description of the proposed additions or changes.  Following receipt of such request, [Royal Caribbean] and Fair Isaac will work together to reach a decision on the proposed change within five (5) business days.  If agreement is reached, the additions or changes will be reflected in a Change Order to this SOW signed by both parties.

Other Services not itemized in Section 1 (Description of Other Services) are outside the scope of this SOW, and requests for such services must follow the above Change Order process, or may be provided pursuant to a separate, mutually agreed SOW. Fair Isaac will not be obligated to perform the services described in the request until the parties have fully executed the Change Order or new SOW.

(Id. at 27-28, § 4.)

The contractual language at issue includes merger and integration language in both the Software Agreement and the Statement of Work. The Software Agreement contains the following merger and integration clause:

Entire Agreement. This Agreement represents the complete agreement of the parties and supersedes all prior or contemporaneous agreements, proposals, understandings, representations, conditions, and communications (oral or written), as well as the terms of all existing or future purchase orders and acknowledgments. Any other terms, conditions, supplements, modifications, or amendments to this Agreement will not be binding upon either party unless expressly set forth in a writing signed by authorized representatives of [Royal Caribbean] and Fair Isaac.

(Id. at 10, § 10.12.) The Statement of Work contains a similar provision, indicating that it, combined with the Software Agreement, constitutes the entire agreement of the parties:

The SOW, together with the applicable provisions of the Agreement, constitutes the entire agreement of the parties with respect to the subject matter of this SOW and supersedes any prior oral or written proposals, representations, promises or agreements. This SOW is subject to the terms and conditions of the Agreement, but in the case of any conflict between the terms of this SOW and the terms of the Agreement, the terms of this SOW will control.

(Id. at 31, § 9.)

The Software Agreement also contains a warranty disclaimer, which disclaims all warranties applicable to any products or services not included in the Software Agreement:

WARRANTY DISCLAIMER. Fair Isaac does not warrant that any

product, service, or deliverable provided by Fair Isaac will (i) meet Client's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac; (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. Fair Isaac is not responsible for problems caused by: (1) use of any product, service, or deliverable provided by Fair Isaac outside the scope of this Agreement or not in compliance with applicable documentation; (b) any modification not made by Fair Isaac; (c) any change in or modification to the Client's system that is inconsistent with the requirements of the applicable documentation; or (d) use of any product or deliverable provided by Fair Isaac with hardware or software that is not represented in the applicable documentation as interoperable with that product or deliverable. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, FAIR ISAAC MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF TITLE AND NON-INFRINGEMENT, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE.  CLIENT IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CLIENT.

(Id. at 5, § 5.3) (emphasis in original).

Royal Caribbean alleges that in late November 2011, Fair Isaac represented that certain items sought by Royal Caribbean were outside the scope of the BRMS Project and would thus incur additional costs in labor and materials.  (Countercl. ¶ 18, Ex. 1 to Hasan Aff. [Doc. No. 18-1].)  At Royal Caribbean's request, Fair Isaac provided a list of 21 items outside the scope of the BRMS Project, which it initially estimated would result in an additional cost to Royal Caribbean of $1,500,000.  After further meetings and discussions between the parties, Fair Isaac provided a revised estimate for the project, arriving at a figure of $309,000 for additional work on the first phase of the project.  (Id. ¶

21.)  Royal Caribbean alleges that Fair Isaac was unwilling to provide an estimate for later phases of the project until the completion of work on the first phase.  (Id.)

On January 27, 2012, Royal Caribbean decided to terminate the parties' agreement and so informed Fair Isaac.  (Id. ¶ 22.)  In March 2012, Fair Isaac commenced this litigation against Royal Caribbean, alleging that Royal Caribbean breached its obligations by failing to make payments as required by the parties' contract.  (Compl. ¶ 22 [Doc. No. 1].)  Along with its Answer, Royal Caribbean filed three counterclaims, asserting claims against Fair Isaac for fraudulent inducement (Counterclaim I); negligent misrepresentation (Counterclaim II); and breach of the implied covenant of good faith and fair dealing (Counterclaim III).  (Answer & Countercl., Ex. 1 to Hasan Aff. [Doc. No. 18-1].)  Royal Caribbean's counterclaims relate to six areas of disputed "capabilities" involved in the performance of the BRMS Project: (1) scalability of the design simulator; (2) the timing of promotion publishing; (3) role-based security; (4) security logging; and (5) integration services.  (Id. ¶ 26.)  Royal Caribbean generally alleges that Fair Isaac made a series of misrepresentations as to these capabilities, prior to the execution of the parties' contract, intending to mislead Royal Caribbean into executing the contract.  (Id.)

Fair Isaac, however, argues that Royal Caribbean's counterclaims fail as a matter of law, are meritless, and therefore moves for their dismissal.  (Pl.'s Mem. Supp. Mot. to Dismiss Countercl. at 1 [Doc. No. 17].)

## II.    DISCUSSION

Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiff argues that Royal Caribbean's counterclaims fail as a matter of law.  First, as to Royal Caribbean's counterclaims for

fraudulent inducement and negligent misrepresentation (Counterclaims I & II), Fair Isaac contends that Royal Caribbean's claims are impermissibly based on parol evidence regarding pre-contract discussions or other representations made outside of the contract. (Pl.'s Mem. at 2 [Doc. No. 17].)  Because such parol evidence is inadmissible, Fair Isaac argues, the plain language of the Software Agreement and Statement of Work controls. Fair Isaac contends that these contractual terms do not provide for the products and services which form the bases of Royal Caribbean's counterclaims.  (Id.)  Further, Fair Isaac argues that even if the Court permits parol evidence and examines these counterclaims on the merits, the claims are directly contradicted and barred by the Software Agreement.  (Id.)  As to Royal Caribbean's counterclaim for a breach of the covenant of good faith and fair dealing, Fair Isaac argues that such a claim cannot be premised on liability that is inconsistent with the terms of the parties' contractual relationship.  (Id. at 2-3.)

Royal Caribbean opposes Plaintiff's motion, arguing that the alleged misrepresentations underlying its fraudulent inducement counterclaim are collateral to the contract, and the counterclaim is therefore permissible.  (Def.'s Opp'n Mem. at 1 [Doc. No. 22].)  Royal Caribbean further argues that it has adequately pled plausible counterclaims for negligent misrepresentation and for the breach of the implied covenant of good faith and fair dealing. (Id.)

## A.    Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the Complaint, or Counterclaim, as is the case here, to be true and construes all reasonable inferences from those facts in the light most favorable to non-moving party.[1] Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn from the facts pled. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). Although a complaint or counterclaim need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." Id. at 555. As the United States Supreme Court recently stated,

---

[1] When considering a Rule 12 motion, the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint," Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999), as well as materials that are "necessarily embraced by the pleadings." Piper Jaffray Cos. v. National Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D. Minn. 1997). See also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1357, at 199 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"). Here, the Court considers Royal Caribbean's Answer & Counterclaim (Ex. 1 to Hasan Aff. [Doc. No. 18-1]), and the exhibits attached thereto. The exhibits include Royal Caribbean's RFP (Ex. A to Countercl. [Doc. No. 18-2]) and Fair Isaac's RFP Response (Ex. B to Countercl. [Doc. No. 18-3]). In addition, the Court considers the Software Agreement (Ex. 4 to Hasan Aff. [Doc. No. 18-5]), as it is embraced by the Answer & Counterclaim and was attached as an exhibit to the Complaint.

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly. Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citing Twombly, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556.

### B.    Fraudulent Inducement (Counterclaim I)

Under New York law, which governs this dispute, a party asserting a claim for fraudulent inducement must allege "(1) a knowingly false representation of a material fact and (2) detrimental reliance thereon." Robinson v. Deutsche Bank Trust Co. Americas, 572 F. Supp.2d 319, 322 (S.D.N.Y. 2008) (applying New York law).[2]  Reliance means "reasonable reliance." Id.  A party's reliance may be considered unreasonable where the alleged misrepresentation is directly contradicted by the written contract. Id.  In addition, common law fraud claims such as this must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). Meisel v. Grunberg, 651 F. Supp.2d 98, 108 (S.D.N.Y. 2009).

### 1.    Parol Evidence

As a threshold matter, under New York law, "[c]ontracts which are clear and unambiguous should be enforced according to their plain meaning." Cellular Tel. Co. v. 210 E. 86th St. Corp., 839 N.Y.S.2d 476, 480 (N.Y. App. Div. 2007).   Moreover, "if a

---

[2]  The Software Agreement specifies that any issues relating to the parties' agreement are to be governed by the laws of the State of New York.  (Software Agreement at 9, § 10.5 [Doc. No. 18-5].)  The parties agree that New York law applies to this matter.

contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993) (applying New York law). However, such a general merger clause is generally ineffective to bar parol evidence of fraudulent misrepresentation. Hobart v. Schuler, 434 N.E.2d 715, 716 (N.Y. 1982). Even where a contract contains "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made," parol evidence of fraudulent inducement may be admitted. Danann Realty Corp. v. Harris, 157 N.E.2d 597, 598-99 (N.Y. 1959). However, such evidence is not admissible in every situation. Wall v. CSX Transp., Inc., 471 F.3d 410, 416, n.5 (2d Cir. 2006) (applying New York law).

For instance, where the contract disclaims reliance on a specific representation, as opposed to a boilerplate disclaimer, parol evidence will not be permitted to support a claim or defense that a party was defrauded into entering the contract in reliance on the parol representations. See Citibank v. Plapinger, 485 N.E.2d 974, 976 (N.Y. 1985); Danann, 157 N.E.2d at 599. In Danann, the purchaser of a building lease sought damages for fraud, contending that it had entered into the lease based on the seller defendants' fraudulent representations "as to the operating expenses of the building and as to the profits to be derived from the investment." 157 N.E.2d at 598. The contract included a disclaimer providing that the seller made no representations as to the expenses or operation of the premises, and that all of the parties' understandings and agreements were merged in the agreement. Id. The contract also stated that neither party relied upon any

statement or representation made by the other, not embodied in the contract.  Id.  The

court acknowledged that while a general merger clause would not bar parol evidence to

support a claim for fraud, it found that the fraud claim in Danaan was barred by the

purchaser's specific disclaimer of any reliance on that specific representation:

> [P]laintiff has in the plainest language announced and stipulated that it is
> not relying on any representations as to the very matter so to which it now
> claims it was defrauded.  Such a specific disclaimer destroys the allegations
> in plaintiff's complaint that the agreement was executed in reliance upon
> these contrary oral representations . . . .

Id. at 599.

In addition to such specific disclaimers, New York courts have also barred parol

evidence to establish fraud in cases where, even though the merger clause was general,

the contracting parties were sophisticated business entities who had negotiated the terms

of the contract.  Plapinger, 485 N.E.2d at 976-77.  In Plapinger, the court considered an

"absolute and unconditional" guarantee of a company's debts made by its corporate

officers in connection with an agreement by the plaintiff banks to restructure the

company's indebtedness.  The guarantee provided that its absolute and unconditional

nature was irrespective of any lack of validity of the restated loan agreement, any other

related instrument, or any other circumstance that might otherwise constitute a defense to

the guarantee.  Id. at 977.  After the corporation defaulted, the banks commenced

litigation to enforce the guarantee against the corporate officers.  In the officers' defense,

they alleged that they had been fraudulently induced to enter into the guarantee based on

the banks' false representation that the banks were committed to providing an additional

line of credit to the corporation.  Id. at 975-76.  The court affirmed the dismissal of the

corporate officers' fraud defense, holding that it was inconsistent with the merger clause.

Id. at 976-77. While the merger clause was not as explicit as in Danaan, the Plapinger

court nonetheless found it sufficiently specific, given the circumstances of a multimillion

dollar personal guarantee proclaimed to be "absolute and unconditional," observing

> [i]t is unrealistic in such circumstances to expect an express stipulation that defendants were not relying on a separate oral agreement to fund an additional multimillion dollar line of credit, when they themselves have denominated their obligation unconditional, and have reinforced that declaration by their agreement that the "absolute and unconditional" nature of their guarantee was "irrespective of (i) any lack of validity *** or any other agreement or instrument relating thereto", or "(vii) any other circumstance which might otherwise constitute a defense" to the guarantee.

Id. at 977. Rejecting the defendants' fraudulent inducement defense, the Plapinger court

concluded

> [t]hough not the explicit disclaimer present in Danann, the substance of defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced to sign the guarantee by the banks' oral promise of an additional line of credit. To permit that would in effect condone defendants' own fraud in "deliberately misrepresenting [their] true intention" (Danann, 5 N.Y.2d at 323) when putting their signatures to their "absolute and unconditional" guarantee.

Id. at 977.

Courts have thus applied Danann to situations "where the substance of the

disclaimer provision tracks the substance of the alleged misrepresentations." Grumman

Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984). Where

specificity – the "touchstone" to this determination – is lacking, courts applying New

York law have ruled the dismissal of a fraud claim is inappropriate. Manufacturers

Hanover Trust Co., 7 F.3d at 315-17 (collecting cases).

Here, Defendant alleges that during the course of the parties' dealings, Fair Isaac made certain representations about the capabilities of its products to fulfill several of Royal Caribbean's requirements for the BRMS Project. (Countercl. ¶¶ 27-52, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) The Software Agreement and Statement of Work contain an integration and merger clause, providing that any oral or written "agreements, proposals, understandings, representations, conditions, and communications," whether made prior to or contemporaneously with the execution of the Software Agreement are superseded. (Software Agreement at 10, § 10.12; Statement of Work at 31, § 9, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) In signing the contract, Royal Caribbean also acknowledged that "[a]ny other terms, conditions, supplements, modifications, or amendments to this Agreement will not be binding upon either party unless expressly set forth in a writing signed by authorized representatives" of the parties. (Id. at 10, § 10.12.) Notably, however, the merger clause does not "specify which oral representations it intends to bar liability for." Junk v. Aon Corp., No. 07-CV-4640 (LMM/GWG), 2007 WL 4292034, *6, n.5 (S.D.N.Y. Dec. 3, 2007).

The Court determines that Royal Caribbean's fraudulent inducement claim cannot be dismissed as a matter of law simply due to the existence of the integration and merger clause in the Software Agreement. In order to bar Defendant's fraudulent inducement claim, based solely on the integration and merger clause, New York law requires that the clause be a negotiated one, as opposed to boilerplate, and it must address the specific subject matter about which the fraud is claimed. The merger and integration clause here does not meet these requirements. The agreement's reference to "all prior or

contemporaneous agreements, proposals, understandings, representations, conditions, and communications (oral and written). . ." does not address the specific subject matter about which the fraud is claimed, let alone reference the RFP, the RFP Response, or any other specific representations between the parties. (Software Agreement at 10, § 10.12, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) Moreover, there are no allegations in the pleadings that the merger clause itself "was addressed as a material term or that its disclaimer language was the subject of negotiation" in the formulation of the contract. Superior Technical Res., Inc. v. Lawson Software, Inc., No. 2003-10104, 2007 WL 4291575, *11 (N.Y. Sup. Ct. Dec. 7, 2007). It may be the case that the clause was the subject of negotiation, but the materials properly before the Court on this Motion to Dismiss do not demonstrate this. The same may be said of the warranty clause, for which there are no facts showing that it was the subject of discussion and negotiation.

While the parties here are sophisticated business entities, represented by counsel, the specificity of the disclaimer provision is the "touchstone" to the Court's determination of whether a fraudulent inducement claim may be dismissed based on the existence of an integration and merger clause. Manufacturers Hanover Trust Co., 7 F.3d at 316. As such specificity has not been demonstrated here, the Court construes the integration and merger clause and warranty clause of the Software Agreement as too non-specific to determine as a matter of law that Royal Caribbean's fraudulent inducement counterclaim must be dismissed.

## 2. Collateral or Material Terms to the Agreement

In the alternative, Plaintiff argues that even if the Court considers Royal Caribbean's parol evidence, Royal Caribbean's fraudulent inducement claim fails as a matter of law because the six terms supporting Defendant's counterclaims are not "collateral" to the parties' contract. (Pl.'s Mem. at 24 [Doc. No. 17].) Royal Caribbean responds that none of the six terms identified in its counterclaims are addressed in the Software Agreement and are therefore collateral to the agreement. (Def.'s Opp'n Mem. at 9 [Doc. No. 22].)

New York law recognizes a claim for fraudulent inducement when the misrepresentation at issue is collateral to the contract. Wall, 471 F.3d at 416 (citing WIT Holding Corp. V. Klein, 724 N.Y.S.2d 66 (N.Y. App. Div. 2001)). If the alleged misrepresentation concerns an issue that is material to the contract, there can be no viable fraudulent inducement claim. See id. at 416-17. In Wall, the court compared the alleged oral promises which preceded the written agreement with the written agreement itself to determine if they addressed common topics. Id. Here, while Defendant contends that the terms must be directly addressed in the contract in order to be considered material, and therefore not collateral, it cites no authority for this proposition. (Def.'s Opp'n Mem. at 9 [Doc. No. 22].) Consistent with Wall, which compares the subject of the oral representation against the written agreement to determine whether they address common subjects, the Court therefore compares the six specific issues identified by Royal Caribbean as the bases of its fraudulent inducement counterclaim against the written agreement to determine whether they address common topics or are collateral to the

agreement.

### a. Scalability of Decision Simulator

First, as to Royal Caribbean's claim that it is entitled to scalability of the Decision Simulator, Royal Caribbean contends that it requires Fair Isaac products to support fifty concurrent users, but that Fair Isaac products are limited to five concurrent users. (Countercl. ¶¶ 27-30, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) However, Royal Caribbean's allegations suggest that it was either aware of this alleged deficiency during the Proof of Concept demonstration, or that Royal Caribbean believed that the Blaze software would support up to 14 users, as it contends that "[d]espite a working group of 14 individuals during the Proof of Concept, Fair Isaac did not inform Royal Caribbean of these restrictions before Royal Caribbean entered into the Agreement and Statement of Work." (Id. ¶ 30.)

Royal Caribbean's RFP appears to be silent as to this alleged scalability requirement. When comparing this claim against the contract, the Software Agreement provides that all products purchased by Royal Caribbean are itemized in Exhibits B and D of the Software Agreement, and that all purchased services are itemized in Exhibits C and D of the Software Agreement. (Software Agreement at 2-4, §§ 2-3, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) There are no references to a 50-concurrent-user scalability requirement. Nor does the Statement of Work list a 50-concurrent-user requirement as an "Assumption" upon which the Software Agreement is based. (Id. at 28.) Thus, the itemized products and services do not include references to scalability requirements – a product or service which Royal Caribbean considers a "material capability" required in

17

order to perform the BRMS Project.  (See Countercl. ¶ 26, Ex. 1 to Hasan Aff. [Doc. No. 18-1].)   In Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co., 807 N.E.2d 876, 880 (N.Y. 2004), the court held that where the parties could have negotiated and included an explicit notice requirement, but failed to do so, judicial insertion of such a contractual term was not justified.  Here, despite Defendant's arguments to the contrary, the scalability requirement is not collateral to the Agreement.  Rather, it is a material product or service.  It could have been a negotiated term included in the products or services set forth in the Software Agreement, like any other material requirement, but it was not.  Because this alleged misrepresentation is not collateral to the contract, it does not support a claim for fraudulent inducement under New York law.  See Wall, 471 F.3d at 416.

### b.     Timing of Promotion Publishing

Royal Caribbean also bases its fraudulent inducement claim on alleged misrepresentations related to the timing of promotion publishing.  (Countercl. ¶¶ 32-34, Ex. 1 to Hasan Aff. [Doc. No. 18-1].)  Defendant contends that its BRMS Project required the ability to publish rule changes in "real time," and that Fair Isaac orally represented that this feature was present in Fair Isaac's proposed solution.  (Id. ¶ 33.)  Royal Caribbean contends, however, that Fair Isaac failed to state that this was not a product feature included in Fair Isaac's proposed solution, but instead was a customization, requiring additional labor and expense.  (Id. ¶ 34.)

Again, the Software Agreement expressly lists all products and services purchased by Royal Caribbean.  (Software Agreement at 14-32, Ex. 4 to Hasan Aff. [Doc. No. 18-5].)  The real time publishing feature, a product or service which Royal Caribbean

contends was a "material capability" for the BRMS Project, is not listed among the other material products and services found in the contract. It is also not found in the "Assumptions" section of the Statement of Work. (Id. at 28.) Other such material terms and basic assumptions are listed. As a material product or service, the real time publishing feature is not collateral to the contract, and cannot form the basis for a claim for fraudulent inducement under New York law. See Wall, 471 F.3d at 416.

### c. Role-Based Security

Royal Carribean identifies "role-based security" as a another "material capability" for the BRMS Project. (Countercl. ¶¶ 35-39, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) "Role-based security is the ability to setup [sic] and enforce access rights for user groups based on their roles." (Id. ¶ 36.) Defendant alleges that Fair Isaac represented in its RFP Response that "[d]efault role-based user authentication and authorization" would be an out-of-the-box-feature of Blaze Advisor, without customization or specialized integration with third-party software." (Id.) (quoting RFP Response). In addition, Royal Caribbean contends that Fair Isaac represented that its system would provide the ability for role-based user task and data access. (Id. ¶ 37.) Further, Defendant asserts that Fair Isaac's representative stated that its proposed solution had the capability to configure access rights based on user roles. (Id. ¶ 38.) Royal Caribbean alleges that later, Fair Isaac indicated that the functionality of this feature, demonstrated during the Proof of Concept, was a customized feature requiring additional labor and expense. (Id. ¶ 39.)

As Royal Caribbean itself acknowledges, Fair Isaac's RFP Response provided for out-of-the-box "[d]efault role-based user authentication and authorization." (RFP

19

Response at 14, ¶ 8(c), Ex. 3 to Hasan Aff. [Doc. No. 18-3].)  The identical language is found in the Software Agreement which provides for out-of-the-box "[d]efault role-based user authentication and authorization."  (Software Agreement at 28, § 5.1.8, Ex. 4 to Hasan Aff. [Doc. No. 18-5].)  This "material capability" for role-based security appears in the contract - it is not collateral to the parties' agreement.  See Wall, 471 F.3d at 416.  While Royal Caribbean contends that it understood it was receiving a different security functionality, a more enhanced product is not specified in the contract.  Rather, Defendant's understanding of the role-based security capability is expressly contradicted by the contract.  Had Royal Caribbean wanted more enhanced or customized role-based security, it could have negotiated for such a feature and included such terms in the written agreement.  For all of these reasons, Royal Caribbean's fraudulent inducement claim based on the role-based security feature fails as a matter of law.

### d.    Security Logging

Royal Caribbean also bases its fraudulent inducement claim on alleged representations made by Fair Isaac concerning security logging capability.  (Countercl. ¶¶ 40-42, Ex. 1 to Hasan Aff. [Doc. No. 18-1].)  "This feature would make a log entry each time a user logs into and out of the BRMS system.  This feature tracks usage, and in the event of unauthorized or unintentional pricing changes, it provides the needed visibility to remediate as appropriate."  (Id. ¶ 40.)  In other words, the feature would track versions of rule changes.  Royal Caribbean contends that Fair Isaac represented in its RFP Response that its proposed solution contained this feature.  (Id. ¶ 41.)

Fair Isaac's RFP Response does indicate that the "[s]ystem provides the ability for

Security Logging," but also refers back to an earlier response regarding security, which provides

> Yes, Blaze Advisor is compatible with external security applications that provide role-based access. Versioning systems (SCCS) typically have built-in security modules that are easily interfaced. An example security module is provided in Blaze that can be used with the built-in Blaze Versioning system (BVS).

(RFP Response at 72, ¶¶ 14, 19, Ex. 3 to Hasan Aff. [Doc. No. 18-3].) However, the "Assumptions" section of the Statement of Work provides that Royal Caribbean was purchasing standard out-of-the-box "versioning" "without customization or integration with third-party software." (Software Agreement at 28, § 5.1.8, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) The Software Agreement thus addresses versioning – the ability to track rule changes – and contradicts Defendant's counterclaim as it relates to security-logging. The security-logging feature, which Royal Caribbean considers a material capability, is thus addressed in the Software Agreement, and cannot be considered collateral to the parties' agreement. See Wall, 471 F.3d at 416. Any prior representations that Fair Isaac may have made are outside the scope of the parties' agreement. For all of these reasons, Defendant's claim for fraudulent inducement based on representations concerning security logging fails as a matter of law.

### e.    Reporting

Royal Caribbean also bases its claim for fraudulent inducement on alleged representations made by Fair Isaac concerning certain ad-hoc reporting features. (Countercl. ¶¶ 43-47, Ex. 1 to Hasan Aff. [Doc. No. 18-1].) Royal Caribbean contends that during the RFP and Proof of Concept process, the parties discussed the various types

of reporting needed to support the BRMS Project.  (Id. ¶ 43.)  Furthermore, Defendant asserts that Fair Isaac represented in its RFP Response that its proposed solution provided comprehensive search, reporting, and monitoring capabilities.  (Id.)

The Statement of Work indicates that Fair Isaac agreed to provide three reports pursuant to the parties' agreement: (1) the Scenario report; (2) the Validation report; and (3) the Statistics report.  (Software Agreement at 26, § 1.7, Ex. 4 to Hasan Aff. [Doc. No. 18-5].)  Reporting requirements are thus addressed in the Software Agreement and are not collateral to it.  See Wall, 471 F.3d at 416.  To the extent that Royal Caribbean sought different, or additional reporting features, it could have negotiated for, and included such terms in the contract.  Having failed to do so, its claim for fraudulent inducement based on the reporting feature fails as a matter of law.

### f.    Integration Services

Royal Caribbean alleges that its BRMS Project required "multiple business integration services."  (Countercl. ¶ 48, Ex. 1 to Hasan Dec. [Doc. No. 18-1].)  Consequently, Defendant contends that the parties discussed integration services - including integration services for shopping and booking - and that Fair Isaac assured Royal Caribbean that these services "were possible."  (Id.)  After engaging in further discussions about integration services requirements, Defendant alleges that Fair Isaac informed Royal Caribbean that the requested multiple integrations were outside the scope of the parties' agreement.  (Id. ¶¶ 48-50.)

As to integration services, the Software Agreement states:

Fair Isaac will assist Client with the deployment of one (1) Blaze Advisor

> decision service within Client's Integration Test environment for Client's integration testing of the application. Up to 200 hours of assistance are provided as part of the fixed estimate to support testing. Additional testing support may be purchased as a block of hours via a change to this SOW.

(Software Agreement at 26, § 1.8, Ex. 4 to Hasan Aff. [Doc. No. 18-5].) The agreement thus addresses integration services, promising one such service, in addition to 200 hours of assistance to support testing. Integration services are therefore not collateral to the contract because the Software Agreement specifically addresses integration services. See Wall, 471 F.3d at 416. To the extent that Royal Caribbean bases its fraudulent inducement claim on representations concerning integration services, it fails as a matter of law.

In sum, the Court finds that Royal Caribbean's counterclaim for fraudulent inducement fails as a matter of law under New York law because the six material capabilities identified by Defendant in support of its claim are not collateral to the contract.

### 3. Reliance

Plaintiff further argues that Royal Caribbean's fraudulent inducement counterclaim should be dismissed because it fails to plausibly allege the element of reliance and that Royal Caribbean cannot demonstrate reasonable reliance on any of the alleged misrepresentations. (Pl.'s Mem. at 31-34 [Doc. No. 17].) Royal Caribbean counters that it has adequately pled reasonable reliance. (Def.'s Opp'n Mem. at 14 [Doc. No. 22].)

A party asserting a claim for fraudulent inducement must demonstrate reasonable reliance. Robinson, 572 F. Supp.2d at 322. In general, under New York contract law,

"reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" Republic Nat. Bank v. Hales, 75 F. Supp.2d 300, 315 (S.D.N.Y. 1999) (quoting Villa Marin Chevrolet v. General Motors Corp., No. 98-CV-6167 (JG), 1999 WL 1052494, *5 (E.D.N.Y. Nov. 18, 1999)). Courts consider the entire context of the transaction in considering whether reliance is reasonable, "including factors such as [the transaction's] complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them." Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).

Addressing a claim for fraudulent inducement in particular, the court in JPMorgan Chase Bank v. Liberty Mut. Ins. Co., observed:

> Fraudulent inducement and fraudulent concealment are familiar defenses to contractual performance. Yet, New York law does not permit a contracting party to lightly evade its contractual obligations by simply crying "fraud." Thus, for example, under New York law, a claim for breach of contract cannot be converted into a fraud claim by simply alleging that the promisor intended not to perform its promise. See Papa's–June Music v. McLean, 921 F. Supp. 1154, 1160–1161 (S.D.N.Y.1996) (collecting cases). Also, of particular relevance here, New York law will not permit a sophisticated party that, in negotiating a contract, has expressly disclaimed reliance on specific oral representations extrinsic to the contract to thereafter claim that the fraudulence of these representations is a defense to contractual performance. See Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

189 F. Supp.2d 24, 26 (S.D.N.Y. 2002). "Courts are more inclined to enforce a disclaimer clause where . . . the contracting parties are "sophisticated business people," and the disclaimer clause is the product of negotiations between them. CDO Plus Mater Fund Ltd. v. Wachovia Bank, N.A., No. 07-CV-11078 (LTS/AJP), 2009 WL 2033048, *4

(S.D.N.Y. July 13, 2009) (citing <u>Plapinger</u>, 485 N.E.2d at 976-77)). Thus, "[w]hen plaintiffs are sophisticated parties and the statement or omission relates to a business transaction that has been formalized in a contract, New York courts are generally reluctant to find reliance on oral communications to be reasonable." <u>Wurtsbaugh v. Banc of America Securities LLC</u>, No. 05-CV-6220 (DLC), 2006 WL 1683416, * 6 (S.D.N.Y. June 20, 2006) (citations omitted).

Both Fair Isaac and Royal Caribbean are sophisticated business entities, represented by counsel. In the course of entering into the comprehensive and fully-integrated contract at issue, they interacted in a variety of ways – through the RFP, the RFP Response, and in the Proof of Concept setting – prior to entering into the Statement of Work and Software Agreement. If Royal Caribbean believed that its six identified "material capabilities" were critical to their decision to enter into the contract (Countercl. ¶ 26, Ex. 1 to Hasan Aff. [Doc. No. 18-1]), it could have protected itself by inserting appropriate language into the Software Agreement. <u>See</u> <u>Emergent Capital</u>, 343 F.3d at 196. Instead, the agreement contains provisions related to these six areas that contradict Defendant's asserted understanding of these required features, as discussed herein. As this Court has found, the six issues are not collateral to the contract. Therefore, any assertion of reliance on earlier representations is unreasonable. <u>See</u> <u>Wurtsbaugh</u>, 2006 WL 1683416 at *7. In addition, the merger clause and warranty disclaimer reflect the parties' intention to enter into a comprehensive agreement, which further undermines the reasonableness of Royal Caribbean's asserted reliance on representations outside of the contract. <u>Id.</u> Based on all of the above, and given Royal Caribbean's status as a

sophisticated, represented business entity, the Court finds that Royal Caribbean cannot establish reliance as a matter of law. In light of the lack of reliance, and because the six material capabilities supporting Royal Caribbean's fraudulent concealment counterclaim are not collateral to the contract, Defendant's counterclaim for fraudulent inducement (Counterclaim I) is dismissed.

### C. Negligent Misrepresentation (Counterclaim II)

Plaintiff moves for the dismissal of Royal Caribbean's negligent misrepresentation counterclaim arguing that, as with the fraudulent inducement counterclaim, parol evidence is inadmissible, and, alternatively, that Royal Caribbean cannot plausibly plead the required element of reliance.

Under New York law, a party asserting a claim of negligent misrepresentation must demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the other party to impart correct information to the claimant; (2) that the information was incorrect; and (3) that the claimant's reliance on the incorrect information was reasonable. J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587 (N.Y. 2007). "Negligent misrepresentation is viewed as a species of fraud that replaces the required showing of scienter with a showing of negligence." Reilly Green Mountain Platform Tennis v. Cortese, No. 12795/06, 2007 WL 7263362, *10 (N.Y. Sup. Nov. 14, 2007) (citing Fromer v. Vogel, 50 F. Supp.2d 227, 243 (S.D.N.Y. 1999)). Claims of negligent misrepresentation must also meet Rule 9(b)'s heightened pleading requirements if based on the same set of facts as intentional fraud claims. Meisel, 651 F. Supp.2d at 107-08.

The analysis of this claim is similar to that of Defendant's counterclaim for fraudulent inducement. For the reasons set forth in detail in the Court's discussion of Defendant's fraudulent inducement counter, the Court reaches the same conclusion as to Royal Caribbean's negligent misrepresentation claim. First, the Court construes the integration and merger clause and warranty clause of the Software Agreement as too non-specific to determine, as a matter of law, that Royal Caribbean's fraudulent negligent misrepresentation counterclaim must be dismissed.

Second, however, the Court considers the element of reliance. Detrimental reliance is an essential element of claims for both fraudulent inducement and negligent misrepresentation. Meyercord v. Curry, 832 N.Y.S.2d 29, 30 (N.Y. App. Div. 2007). For the reasons stated in the Court's discussion of reliance in the fraudulent inducement counterclaim, the Court likewise finds that reliance is lacking with respect to the negligent misrepresentation counterclaim. Given the level of business sophistication of the parties and the fact that the alleged misrepresentations are contradicted by the terms of the contract, any reliance that Royal Caribbean placed on Plaintiff's representations is unreasonable as a matter of law. Defendant's claim for negligent misrepresentation therefore fails and is dismissed.

### D. Breach of Implied Covenant of Good Faith and Fair Dealing (Counterclaim III)

Fair Isaac moves to dismiss Royal Caribbean's counterclaim for a breach of the implied covenant of good faith and fair dealing. In this counterclaim, Royal Caribbean alleges that by characterizing multiple required elements of the BRMS Project as outside

the scope of the Project, after previously representing that the elements were within the Project's scope, Fair Isaac deprived Royal Caribbean of the right to receive the benefit of the bargain. (Countercl. ¶ 59, Ex. 1 to Hasan Decl. [Doc. No. 18-1].)

New York courts have held that an action for the breach of the implied covenant of good faith and fair dealing "is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291-92 (N.Y. 1995) (quoting Murphy v. American Home Prods. Corp., 448 N.E.2d 86, 92 (N.Y. 1983)).

> Under New York law, a duty of good faith and fair dealing is implicit in every contract. National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004). While the duty includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract," id. (citation omitted), the duty is limited by the language of the contract and "can only impose an obligation consistent with other mutually agreed upon terms in the contract." Broder v. Cablevision Systems Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (citation omitted). Because the duty arises from the terms of the contract, a breach of the duty of good faith and fair dealing "is merely a breach of the underlying contract." National Market Share, 392 F.3d at 525 (citation omitted).

Wurtsbaugh, 2006 WL 1683416 at * 5.

For the Court to find that Fair Isaac has breached its duty, it would be necessary to read into the Software Agreement the requirement that Fair Isaac provide the six required elements that Royal Caribbean claims were represented as being within the scope of the BRMS Project – (1) the scalability of the design simulator; (2) the timing of promotion publishing; (3) role-based security; (4) security logging; (5) reporting; and (6) integration services. However, imposing an obligation based on the six alleged required elements

would create an obligation that is inconsistent with the terms of the Software Agreement itself, as set forth herein in the Court's discussion of the fraudulent inducement counterclaim.  Because such an obligation is beyond the scope of the duty of good faith and fair dealing, this claim fails as a matter of law.  Plaintiff's motion is therefore granted as it relates to the dismissal of Counterclaim III.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Plaintiff's Motion to Dismiss Counterclaims [Doc. No. 12] is **GRANTED**; and

2.   Defendant's Counterclaims (I-III) are **DISMISSED WITH PREJUDICE**.

Dated:   January 15, 2013                         S/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge